# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

|                          |   |                          |
|--------------------------|---|--------------------------|
| **TOMI BOONE FINKLE**    | * |                          |
|   Plaintiff    | * |                          |
|   v.           | * | **CIVIL No. JKB-13-3236** |
| **HOWARD COUNTY, MARYLAND** | * |                       |
|   Defendants   | * |                          |

\* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM

Tomi Boone Finkle ("Plaintiff") brought this suit against Howard County, Maryland ("Defendant") alleging discrimination on the basis of Plaintiff's sex, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2(a)(1), and the Maryland Fair Employment Practices Act ("FEPA"), Md. Code, State Gov't § 20-606. Now pending before the Court are Defendant's motion to dismiss Plaintiff's complaint or, alternatively, for summary judgment (ECF No. 4) and a motion by the American Civil Liberties Union, the American Civil Liberties Union Of Maryland, Free State Legal Project, Inc., Lamda Legal, the National Center for Lesbian Rights, and the Transgender Law Center (collectively "*Amici*") to file an *amicus curiae* memorandum in support of Plaintiff's opposition to Defendant's motion to dismiss ("*Amicus Curiae* Motion") (ECF No. 13). The issues have been briefed and no hearing is required. Local Rule 105.6. For the reasons set forth below, Defendant's motion to dismiss Plaintiff's complaint or, alternatively, for summary judgment (ECF No. 4) will be DENIED and the *Amicus Curiae* Motion (ECF No. 13) will also be DENIED.

I.  **BACKGROUND**[1]

Plaintiff is a retired Sergeant of the United States Capitol Police ("USCP"). (ECF No. 1, Compl., at ¶ 1.) After she retired from the USCP, in March, 2002, Plaintiff "transitioned her gender identity from male to female." (*Id.* at ¶¶ 13, 16.) Plaintiff now identifies as female. (*Id.* at ¶ 16.)

In 2000, Plaintiff joined "TrotSAR, a horse mounted search and rescue organization in Crownsville, Maryland." (*Id.* at ¶ 15.) Initially a "Mounted Search Officer," Plaintiff was promoted to "Assistant Commander" in 2003 and later to "Commander" in 2006. (*Id.*) Plaintiff continues to serve as the Commander of the organization. Also, from 2002 to 2008, Plaintiff served in the "District of Columbia Metropolitan Police Department's Police Auxiliary." (*Id.*)

In 2010, the Howard County Police Department (HCPD) asked TrotSAR to provide horse mounted patrols in county parks and during special events. (*Id.* at ¶ 19.) In addition to coordinating this service, Plaintiff assisted the HCPD in creating its own horse-mounted police auxiliary program. (*Id.*)

In 2011, HCPD announced the creation a Volunteer Mounted Patrol ("VMP") to perform "uniformed (non-confrontational) patrols at County parks and large events." (*Id.* at ¶ 21.) Although a volunteer program, VMP Auxiliary Police Officers ("APO") are "entitled to significant remuneration benefits available upon injury or death," as well as "good and valuable training service opportunities." (*Id.* at ¶¶ 41, 46.)

In September 2011, Plaintiff submitted an application to volunteer as an APO in the VMP. (*Id.* at ¶¶ 21, 22.) After passing a horse and rider skills test, administered by HCPD

---

[1] The facts are recited here as alleged by the Plaintiff, this being a motion to dismiss. *See Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997).

Lieutenant Timothy Black, on December 7, 2011, Plaintiff advanced to the final step in the selection process, which was a panel interview at HCPD headquarters. (*Id*. at ¶¶ 23, 24.)

When Plaintiff arrived for her interview, William McMahon, the HCPD Chief of Police, "confronted [Plaintiff]" and "demanded to know why [she] was applying for a position" with the VMP. (*Id.* at ¶ 25.) After Plaintiff answered McMahon's question, he wished her "'good luck' and walked away." (*Id*.) Plaintiff claims that "[u]pon information and belief, McMahon shortly thereafter expressed to [Black] his displeasure with [Plaintiff's] application to be a member of the [VMP]." (*Id*. at ¶ 26.)

On December 22, 2011, Black informed Plaintiff that she "did not make the cut" for the VMP. (*Id*. at ¶ 27.) When pressed to explain this decision, Black provided that the HCPD was not accepting retired police officers for the position. (*Id.* at ¶ 27.) Black also informed Plaintiff that she was overqualified and lived too far away. (*Id.* at ¶¶ 27, 28.)

In March, 2012, Plaintiff learned that one of the applicants who was accepted into the VMP was a retired police officer and that two lived further from Howard County than Plaintiff. (*Id.* at ¶ 29.) "On information and belief, Chief McMahon ordered Lt. Black and the other members of the selection panel to deny a position to [Plaintiff] because of her obvious transgendered status." (*Id*.)

Immediately following her rejection from the VMP, Plaintiff filed a complaint with the Maryland Commission on Human Rights ("MCHR"). (*Id.* at ¶ 31.) On September 20, 2012, this complaint was rejected on the merits. (*Id.* at ¶ 32.) Plaintiff objected to the dismissal, but the decision was upheld by the Deputy Director of the MCHR on May 29, 2013. (*Id.* at ¶¶ 33, 34.) On August 6, 2013, Plaintiff received a "right to sue" letter from the U.S. Equal Employment Opportunity Commission ("EEOC"). (*Id.* at ¶35.)

On October 31, 2013, Plaintiff filed the present action alleging that Defendant "depriv[ed] the otherwise qualified Plaintiff of a position with the [HCPD's VMP] solely because of Plaintiff's sex, to wit, her gender identification and non-conforming gender conduct." (*Id.* at 1.) Defendant now moves to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure or, in the alternative, for summary judgment. (ECF No. 4.) In addition, *Amici* seek leave to file a memorandum in support of Plaintiff's opposition to Defendant's motion to dismiss. (ECF No. 13.)

## II. ANALYSIS

### A. *Amicus Curiae* Motion

*Amici* have moved for leave to submit a memorandum in support of Plaintiff's opposition to Defendant's motion to dismiss. (ECF No. 13.) Here, *Amici* are "six national and regional organizations engaged in legal, policy, and educational work on issues affecting the lesbian, gay, bisexual, and transgender community." (ECF No. 13 at 1.)

The decision of whether to grant such a motion is left to the discretion of the trial judge. *Bryant v. Better Business Bureau of Greater Maryland*, 923 F.Supp. 720, 728 (D. Md. 1996) (citing *Hoptowit v. Ray*, 682 F.2d 1237, 1260 (9th Cir. 1982); *Waste Management v. York*, 162 F.R.D. 34, 36 (M.D. Pa. 1995)). However, the Court notes that "at the trial level, where the issues of fact as well as law predominate, the aid of *amicus curiae* may be less appropriate than at the appellate level where such participation has become standard procedure." *Id.* at 727 (quoting *Yip v. Pagano*, 606 F. Supp. 1566, 1568 (D.N.J 1985), *aff'd*, 782 F.2d 1033, *cert. denied*, 476 U.S. 1141). Ultimately, a "motion for leave to file an *amicus curiae* brief . . . should not be granted unless the court 'deems the proffered information timely and useful.'" *Id.* (quoting *Yip*, 606 F.Supp. at 1568).

4

The Court recognizes that, here, *Amici* have significant "collective experience with litigation and policy advocacy" that is relevant to many of the issues raised by the present case. (ECF No. 13 at 1.) However, the *Amicus Curiae* motion (ECF No. 13) is not timely. Indeed the motion was filed on April 4, 2014—that is 101 days after Defendant filed its motion to dismiss (ECF No. 4), 73 days after Plaintiff filed her response in opposition (ECF No. 7), and 45 days after Defendant filed its reply (ECF No. 12). *Amici*'s brief therefore comes too late to be useful to the Court in resolving Defendant's motion to dismiss (ECF No. 4) and thus the *Amicus Curiae* motion (ECF No. 13) will be denied.

**B. Plaintiff's motion to dismiss or, alternatively, for summary judgment**

In support of its motion to dismiss or, alternatively, for summary judgment (ECF No. 4), Defendant relies on three arguments to establish that Plaintiff has failed to state a claim for which relief can be granted: (1) the VMP APO position is a volunteer position and is therefore not covered by Title VII or FEPA; (2) Plaintiff has failed to state a claim for discrimination based on sex under Title VII; and (3) Plaintiff's allegations are conclusory. (ECF Nos. 4 at 1; 12 at 1.)[2]

FEPA is the state law analogue of Title VII and its interpretation is guided by federal cases interpreting Title VII. *Haas v. Lockheed Martin Corp.*, 914 A.2d 735, 742 (Md. 2007). Therefore, for purposes of this memorandum, this Court's analysis of Plaintiff's Title VII claims shall constitute its analysis of Plaintiff's FEPA claims. *See, e.g., Linton v. Johns Hopkins Univ. Applied Physics Lab.*, Civ. No. JKB-10-276, 2011 WL 4549177, at *4 (D. Md. Sept. 28, 2011) (applying Title VII case law to pendent FEPA claims).

---

[2] In evaluating Defendant's motion to dismiss (ECF No. 4), the Court will not consider the two exhibits attached to Defendant's motion (ECF No. 4-2 and 4-3) as the purpose of a 12(b)(6) motion is to consider the allegations in the complaint. 5B Charles Alan Wright & Arthur R. Miller, *Fed. Prac. & Proc. Civ.* § 1357 (3d ed.)

The Court begins by evaluating Defendants' claim that because the VMP APO position is a volunteer position, Plaintiff has failed to state a claim under Title VII, which only covers employment relationships. (*Id.* at 2-3.)

The text of Title VII is not particularly helpful in addressing this issue. The statute provides that "it shall be an unlawful employment practice for an employer to fail to hire . . . any individual . . . because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). The statute further defines "employer" as a "person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year. . . ." § 2000e(b). In turn, "employee" is defined as "an individual employed by an employer." § 2000e(f).

At first blush it may seem that a volunteer, i.e. one who does not receive wages or a salary, is not in an employment relationship. *Cf. Graves v. Women's Professional Rodeo Ass'n, Inc.*, 907 F.2d 71, 73 (8th Cir. 1990) ("Compensation by the putative employer to the putative employee in exchange for his services is not a sufficient condition, but it is an essential condition to the existence of an employer-employee relationship.") However, as the Fourth Circuit explained in *Haavistola v. Community Fire Co. of Rising Sun, Inc.*, 6 F.3d 211 (4th Cir. 1993), even where a volunteer does not receive direct compensation, benefits may represent "indirect but significant remuneration" and therefore establish an employment relationship for purposes of Title VII. *Id.* at 222.

The *Haavistola* Court explained that the crucial inquiry in determining whether an individual is an employee under Title VII is as follows:

> [W]hether an individual is an employee . . . is properly determined by analyzing the facts of each employment relationship under a standard that incorporates both the common law test derived from principles of agency and the so-called

6

'economic realities' test first announced in *Bartels v. Birmingham*, 332 U.S. 126 (1947).

*Haavistola*, 6 F.3d at 220 (quoting *Garrett v. Philips Mills, Inc.*, 721 F.2d 979 (4th Cir. 1983)). Where, as here, the case involves a volunteer, the court emphasized that the primary focus should not be on the employer's control of the individual but rather on whether or not "as a matter of economic reality [an individual is] dependent upon the business to which they render services." *Id.* (quoting *Bartels*, 332 U.S. at 130).

In *Haavistola*, the plaintiff was a volunteer at a privately-formed corporation that provided "firefighting, emergency medical/paramedic, and rescue services to Rising Sun, Maryland and the surrounding area." *Id*. at 213. Although she received no direct compensation, plaintiff "did not affiliate with the company without reward entirely." *Id.* at 221. In particular, as a volunteer, she received the following benefits:

> state-funded disability pension, survivors' benefits for dependents; scholarships for dependents upon disability or death; bestowal of a state flag to family upon death in the line of duty; benefits under the Federal Public Safety Officers' Benefits Act when on duty; group life insurance; tuition reimbursement for courses in emergency medical and fire service techniques; coverage under Maryland's Workers Compensation; tax-exemptions for unreimbursed travel expenses; ability to purchase, without paying extra fees, a special commemorative registration plate for private vehicles; and access to a method by which she may obtain certification as a paramedic.

*Id.* at 221 (internal citations omitted). On a motion for summary judgment, the district court had found that these benefits were insufficient to make the plaintiff an employee under Title VII. *Id.* However, the court of appeals reversed the lower court, holding that:

> Because compensation is not defined by statute or case law, . . . it cannot be defined as a matter of law. The district court must leave to a factfinder the ultimate conclusion whether the benefits represent indirect but significant remuneration as [the plaintiff] contends or inconsequential incidents of an otherwise gratuitous relationship as the [defendant] argues.

*Id.* at 221-22.

The facts in the case at bar are very similar to the ones in *Haavistola*. Indeed, here, Plaintiff alleges that as an APO in the VMP, she would have been entitled to "significant remuneration benefits available upon injury or death." (Compl. at ¶ 41.)

Nonetheless, Defendants cite to Judge Titus's opinion in *Evans v. Wilkinson*, 609 F. Supp.2d 489 (D. Md. 2009), as persuasive authority in support of their contention that, despite the holding in *Haavistola*, Plaintiff's claim does not fall within the ambit of Title VII. In *Evans*, Judge Titus found that a volunteer EMT, who received no salary but did enjoy certain indirect benefits, was not an "employee" under Title VII. *Id.* at 497. There, the plaintiff was eligible, upon meeting certain conditions, to receive benefits as a result of volunteering with the Lexington Park Volunteer Rescue Squad, namely: (1) a Length of Service Program that provided volunteers who had reached the age of 55 and completed at least 20 years of "certified active volunteer service" with a monthly payment of $125 for the rest of their life; (2) a first-time homeowner's assistance program that provided eligible volunteers with up to $12,500 toward the purchase of their first home; and (3) a scholarship program for Volunteer Rescue Squad volunteers who satisfied the Length of Service Program requirements. 609 F. Supp.2d at 494-96. However, the court found that the plaintiff had failed to "adduce[] evidence that she actually *received* any of the benefits—or was even eligible for—those benefits." *Id.* at 496 (emphasis in original). As a result, Judge Titus found that the plaintiff did not qualify as an "employee under Title VII "because, viewing the entire factual situation the 'economic reality' is that Plaintiff was not dependent upon the Volunteer Rescue Squad."

However, the present case is distinguishable from *Evans*. Here, Plaintiff's allegation is that as an APO in the VMP she would immediately have been eligible for and received certain benefits—in particular "significant remuneration benefits available upon injury or death."

8

(Compl. at ¶ 41.) Indeed, these insurance-type benefits would have provided her with coverage as soon as she began working. In this respect, the facts of this case very strongly resemble those in *Haavistola*, where the benefits package also consisted largely of benefits available upon injury or death. In fact, with the exception of "tuition reimbursement for courses in emergency and medical and fire service techniques; . . . tax-exemptions for unreimbursed travel expenses; ability to purchase, without paying extra fees, a special commemorative registration plate for private vehicles; and access to a method by which she may obtain certification as a paramedic" *all* of the benefits in *Haavistola*, namely "state-funded disability pension, survivors' benefits for dependents; scholarships for dependents upon disability or death; bestowal of a state flag to family upon death in the line of duty; benefits under the Federal Public Safety Officers' Benefits Act when on duty; group life insurance; . . .[and] coverage under Maryland's Workers Compensation," were benefits available upon injury or death. *Haavistola*, 6 F.3d at 221-22.

The Court concedes that some of its sister courts have held that "line-of duty benefits" are not guaranteed forms of remuneration and therefore cannot be considered compensation for services for purposes of Title VII. *See, e.g., Holder v. Town of Bristol*, No. 3:09-CV-32 PPS, 2009 WL 3004552 (N.D. Ind., Sept. 17, 2009) (As for the line-of-duty benefits that Holder received—workers' compensation, disability insurance, and death benefits—these are not guaranteed forms of remuneration. Holder and his dependents would have only seen a dime if something bad happened to him while he was on duty. . . . It's worth noting that these insurance benefits are just as much for the Town's protection as they are for the reserve officers. If Holder had injured himself and made a claim against the Town, the policies would cover the medical costs. So, without more, it can't be said that these mechanisms for insuring risk had independent value in exchange for labor."); *see also Scott v. City of Minco*, 393 F.Supp.2d 1180, 1190 (W.D.

Okla. 2005) (collecting cases). However, those cases explicitly rejected the Fourth Circuit's *Haavistola* holding in doing so. *E.g., City of Minco*, 393 F. Supp.2d at 1190 ("This Court recognizes that this conclusion is contrary to that reached by the Fourth Circuit in *Haavistola*.")

This Court, however, is bound by the Fourth Circuit's pronouncements in *Haavistola* and therefore cannot find, as a matter of law, that the "significant remuneration benefits available upon injury or death" Plaintiff would have received as an APO in the VMP are insufficient to bring her under the ambit of Title VII. *Haavistola*, 6 F.3d at 222.

The Court next considers Defendant's argument that Plaintiff's claim is not a cognizable claim of discrimination on the basis of sex under Title VII. (ECF No. 4-1 at 3-4.) Here, Plaintiff has claimed that that her application to join the VMP was denied "because of her obvious transgendered status" (Compl. at ¶ 30) and therefore that Defendant "depriv[ed] the otherwise qualified Plaintiff of a position with the [HCPD's VMP] solely because of Plaintiff's sex, to wit, her gender identification and non-conforming gender conduct." (*Id.* at 1.)

In *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), the Supreme Court held that because Title VII prohibits discrimination on the basis of sex, employers may not discriminate on the basis of an employee's (or prospective employee's) failure to conform to gender stereotypes. The Court explained that "we are beyond the day when an employer could evaluate employees by assuming or insisting that they matched the stereotype associated with their group." *Id.* at 251 (plurality opinion).

In the wake of *Price Waterhouse*, a number of sister courts have found that Title VII protects transgender employees who are discriminated against for failing to conform to gender stereotypes. For example, in *Smith v. City of Salem*, 378 F.3d 566, 574-75 (6th Cir. 2004), the Sixth Circuit explained that:

> *Price Waterhouse* . . . does not make Title VII protection against sex stereotyping conditional or provide any reason to exclude Title VII coverage for non sex-stereotypical behavior simply because the person is a transsexual. As such, discrimination against a plaintiff who is a transsexual—and therefore fails to act and/or identify with his or her gender—is no different from the discrimination directed against Ann Hopkins in Price Waterhouse, who, in sex-stereotypical terms, did not act like a woman. Sex stereotyping based on a person's gender non-conforming behavior is impermissible discrimination, irrespective of the cause of that behavior; a label, such as "transsexual," is not fatal to a sex discrimination claim where the victim has suffered discrimination because of his or her gender non-conformity. Accordingly, we hold that Smith has stated a claim for relief pursuant to Title VII's prohibition of sex discrimination.

Similarly, in *Schroer v. Billington*, 577 F.Supp.2d 293, 308 (D.D.C. 2008), Judge Robertson concluded that:

> [i]n refusing to hire Diane Schroer because her appearance and background did not comport with the decisionmaker's sex stereotypes about how men and women should act and appear, and in response to Schroer's decision to transition, legally, culturally, and physically, from male to female, the Library of Congress violated Title VII's prohibition on sex discrimination.

*See also Glenn v. Brumby*, 663 F.3d 1312, 1317 (11th Cir. 2011) (collecting cases) ("Accordingly, discrimination against a transgender individual because of her gender-nonconformity is sex discrimination, whether it's described as being on the basis of sex or gender. Indeed several circuits have so held. . . . These instances of discrimination against plaintiffs because they fail to act according to socially prescribed gender roles constitute discrimination under Title VII according to the rationale of *Price Waterhouse*."); *cf. Hart v. Lew*, Civ. No. ELH-12-03482, 2013 WL 5330581 at *15 (D. Md. Sept. 23, 2013) ("Defendant does not contend that plaintiff, as a transsexual, is not protected by Title VII's prohibition on sex discrimination, and so I will assume for purposes of this motion that plaintiff is within Title VII's aegis.").

However, in *Schroer*, Judge Robertson also cautioned that "when the plaintiff is transsexual, direct evidence of discrimination based on sex stereotypes may look a great deal like

discrimination based on transsexuality itself, a characteristic that, in and of itself, nearly all federal courts have said is unprotected." 577 F.Supp.2d at 305 (collecting cases). Likewise, in *Etsitty v. Utah Transit Authority*, 502 F.3d 1215, 1222 (10th Cir. 2007), the court held that transsexuals are not a protected class under Title VII. In so holding, both the *Schroer* Court and the *Etsitty* Court drew on pre-*Price Waterhouse* cases, including *Ulane v. Eastern Airlines, Inc.*, 742 F.2d 1081, 1084-85 (7th Cir. 1984), *Sommers v. Budget Marketing, Inc.*, 667 F.2d 748, 749-750 (8th Cir. 1982), and *Holloway v. Arthur Andersen & Co.*, 566 F.2d 659, 662-63 (9th Cir. 1977). These cases held that Title VII's "prohibition on sex discrimination mean only that it is 'unlawful to discriminate against women because they are women and men because they are men.'" *Etsitty*, 502 F.3d at 1221 (quoting *Ulane*, 742 F.2d at 1085).

In light of *Price Waterhouse*, it is unclear what, if any, significance to ascribe to the conclusion that "transsexuals are not protected under Title VII *as transsexuals*." *Etsitty*, 502 F.3d at 1222. Indeed, it would seem that any discrimination against transsexuals (as transsexuals)—individuals who, by definition, do not conform to gender stereotypes—is proscribed by Title VII's proscription of discrimination on the basis of sex as interpreted by *Price Waterhouse*. As Judge Robertson offered in *Schroer*, "[u]ltimately I do not think it matters for purposes of Title VII liability whether the Library withdrew its offer of employment because it perceived Schroer to be an insufficiently masculine man, an insufficiently feminine woman, or an inherently gender-nonconforming transsexual." 577 F.Supp.2d at 305. Further, in *Schwenk v. Hartford*, 204 F.3d 1187, 1201 (9th Cir. 2000), a unanimous panel of the Ninth Circuit held that "[t]he initial judicial approach taken in cases such as *Holloway* has been overruled by the logic and language of *Price Waterhouse*. . . . [U]nder *Price Waterhouse*, "sex" under Title VII encompasses both sex—that is, the biological differences between men and women—*and*

[socially-constructed] gender [expectations]." *See also Smith*, 378 F.3d at 573 ("[T]he approach in *Holloway*, *Sommers*, and *Ulane* . . . has been eviscerated by *Price Waterhouse*. . . . [T]he Supreme Court established that Title VII's reference to 'sex' encompasses both the biological differences between men and women, and gender discrimination, that is, discrimination based on a failure to conform to stereotypical gender norms.") Even in *Etsitty*, the court did not issue a contrary ruling. Rather, the court assumed without deciding that Title VII protects "transsexuals who act and appear as a member of the opposite sex." *Etsitty*, 502 F.3d at 1224.

Therefore, on the basis of the Supreme Court's holding in *Price Waterhouse*, and after careful consideration of its sister courts' reasoned opinions, this Court finds that Plaintiff's claim that she was discriminated against "because of her obvious transgendered status" is a cognizable claim of sex discrimination under Title VII. To hold otherwise would be "to deny transsexual employees the legal protection other employees enjoy merely by labeling them as transsexuals." *Etsitty*, 502 F.3d at 1222 n.2 (citing *City of Salem*, 378 F.3d at 575).

Third, the Court considers whether Plaintiff has adequately pleaded her discrimination claim. As the Fourth Circuit has explained, "while a Title VII plaintiff is not required to plead facts that constitute a prima facie case in order to survive a motion to dismiss, factual allegations must be enough to raise a right to relief above the speculative level." *Templeton v. First Tennessee Bank, N.A.,* 424 Fed. Appx. 249, 250 (4th Cir. 2011).

Here, the Court finds that Plaintiff has alleged sufficient facts to state a claim of sex discrimination in employment that is plausible on its face. Although Plaintiff's complaint represents something of a close call, it sets forth sufficient allegations to allow the Court to "draw the reasonable inference" that her application to join the VMP was denied "because of her obvious transgendered status" and her failure to conform with gender norms. (Compl. at ¶ 30.)

Specifically, Plaintiff alleges that she does not conform to gender stereotypes in that she is "obvious[ly] transgender[]." (Compl. at ¶ 6.) In her opposition to Defendant's motion to dismiss, she further explains that she is a "6'3", 220 pound, broad-shouldered [individual] with C cup breasts, shoulder length blond hair" and that on December 7, 2011, the day of her final interview with the HCPD, she was wearing a skirt. (ECF No. 7 at 14 n.1.)

She further alleges that she was "well qualified and otherwise suitable for appointment" to the VMP. (Compl. at ¶ 38.) In fact, according to her complaint, Plaintiff was the Commander of "TrotSAR, a horse mounted search and rescue organization in Crownsville, Maryland" and, in that capacity, helped the HCPD "develop[] and implement[]" the VMP. (*Id.* at ¶¶ 15, 20.)

In September 2011, Plaintiff applied to join the VMP as an APO and passed the initial "horse and rider skills test." (*Id*. at ¶¶ 21, 22, 23.) However, after an in-person panel interview at HCPD headquarters, which was the final step in the selection process, she was informed that she "did not make the cut." (*Id*. at ¶¶ 24, 27.) Plaintiff alleges that "[o]n information and belief, [HCPD] Chief McMahon[, whom Plaintiff met immediately prior to her interview,] ordered Lt. Black and the other members of the selection panel to deny a position to [Plaintiff] because of her obvious transgender status." (*Id.* at ¶ 30.)

Plaintiff buttresses the plausibility of her claim by further alleging that, when she asked Black to explain the HCPD's decision, he provided pretextual reasons.[3] In particular, he explained that the HCPD "would not accept any retired police officer for the position" and later added that she was "overqualified" and "lived too far away." (*Id.* at ¶¶ 27, 28.) However,

---

[3] At this stage in the proceedings, the Plaintiff need not plead a *McDonnell Douglas* prima facie case. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 at 547 (2007) (citing *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 508 (2002)), *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). However, even outside of the *McDonnell Douglas* paradigm, an allegation that someone has offered a pretextual reason can be probative. In particular, here, Plaintiff's allegation that Defendant offered only pretextual reasons for not hiring her makes her claim of discrimination more plausible.

Plaintiff later learned that (1) "another retired police officer was indeed selected for the [VMP]" and (2) "at least two persons selected lived on the Eastern Shore of Maryland, at a greater distance from Howard County than [she did]." (*Id.* at ¶ 29.)

On the basis of these allegations, the Court finds that Plaintiff's claim that she suffered unlawful discrimination is plausible and therefore is sufficiently well pleaded to survive the present motion to dismiss. Therefore, the Court will not dismiss Plaintiff's complaint (ECF No. 1).

Finally, the Court finds that Defendant's motion, in the alternative, for summary judgment (ECF No. 4) is premature. The Court does not find that Defendant has shown that there is no genuine dispute as to any material fact, especially with regard to the reasons for the denial of Plaintiff's application.

For these reasons, Plaintiff's motion to dismiss or, alternatively, for summary judgment (ECF No. 4) shall be denied. However, this denial is without prejudice to the parties' right to file motions for summary judgment at later points in the litigation.

**CONCLUSION**

Accordingly, an order shall issue DENYING Defendant's motion to dismiss or, alternatively, for summary judgment (ECF no. 4) and DENYING *Amici*'s *Amicus Curiae* Motion (ECF No. 13).

Dated this <u>10th</u> day of April, 2013.

> BY THE COURT:
>
> _____/s/_____
> James K. Bredar
> United States District Judge