**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

|  |  |  |
|---|---|---|
| **TOMI BOONE FINKLE,** | * | |
| Plaintiff, | * | |
| v. | * | Civil Case No. SAG-13-3236 |
| **HOWARD COUNTY, MARYLAND,** | * | |
| Defendant. | * | |

**MEMORANDUM OPINION**

Plaintiff Tomi Boone Finkle ("Ms. Finkle") brought this action against Defendant Howard County, Maryland ("Howard County") alleging employment discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2(a)(1), and the Maryland Fair Employment Practices Act ("FEPA"), Md. Code, State Gov't § 20-606. [ECF No. 1]. Specifically, Ms. Finkle alleges that she was not selected for a position with the Howard County Police Department's Volunteer Mounted Patrol because of her "sex, *to wit*, her gender identification and non-conforming gender conduct." *Id.* Ms. Finkle is a transgender woman,[1] having transitioned her gender identity from male to female in 2002. *Id.* The Court has reviewed the parties' cross-motions for summary judgment, oppositions, and replies thereto. [ECF Nos. 49, 57, 58, 61]. No hearing is deemed necessary. *See* Loc. R. 105.6 (D. Md. 2014). For the reasons set forth herein, Howard County's Motion for Summary Judgment will be **GRANTED**, and Ms. Finkle's Cross-Motion for Summary Judgment will be **DENIED**.

---

[1] Although Ms. Finkle, and some other sources, routinely employ the term "transgendered," the Court will use the terms "transgender" or "transgender woman" to describe Ms. Finkle, in accordance with the GLAAD Media Reference Guide for Transgender Issues, available at http://www.glaad.org/reference/transgender.

1

## I. FACTS

Ms. Finkle has spent the majority of her career in law enforcement.  *See* Def. Mot. 2–3. In 2002, she retired as a sergeant from the United States Capitol Police after twenty-five years of service.  *Id.* at 2.  Since then, Ms. Finkle has worked in a variety of law enforcement and disaster/emergency management positions, including as an auxiliary officer with the District of Columbia Metropolitan Police Department from 2002 to 2009.  *Id.* at 3.  Since 2000, Ms. Finkle has also served on TrotSAR, a volunteer horse-mounted search and rescue organization that serves the mid-Atlantic region.  *Id.*  Ms. Finkle has been the commander of TrotSAR since 2006.  *Id.*

In the summer of 2009, Lieutenant Timothy Black of the Howard County Police Department ("HCPD"), who at the time was TrotSAR's Assistant Commander and Training Officer, considered creating a volunteer horse-mounted patrol unit within the HCPD.  *Id.* at 3–4. When he mentioned this idea to Ms. Finkle, with whom he worked closely, she noted that she would be interested in participating, and that other TrotSAR members may be interested as well. *Id.*, Exh. 9.  In the summers of 2010 and 2011, TrotSAR members, including Ms. Finkle, partnered with the HCPD to provide mounted patrols for various events in Howard County.  Def. Mot. 4–5, 7–8.  While Lt. Black contemplated the idea of the HCPD forming a more permanent partnership with TrotSAR, he ultimately decided to create an independent, in-house volunteer mounted patrol unit.  *Id.* at 7–8.  Lt. Black believed that an informal, public relations-oriented program, as opposed to a more formal, standards-oriented program like TrotSAR, was a better fit for the HCPD.  *Id.* at 9, Exh. 2 (Black Affidavit), ¶¶ 13–14.  Lt. Black envisioned a program where members would ride on trails in Howard County and serve as an extra set of "eyes and ears" for the HCPD—communicating information to the police rather than taking direct action.

2

*Id.* He aimed to model HCPD's program after the Maryland-National Capital Park Police's ("MNCPP") mounted patrol unit. *Id.*

By September, 2011, HCPD Chief of Police William ("Bill") McMahon approved the creation of an HCPD Volunteer Mounted Patrol ("VMP"), and Lt. Black sent out a notice to interested TrotSAR members and others in the equestrian community to apply. Def. Mot. 8–9. The HCPD received approximately seventy-five applications, including one from Ms. Finkle. *Id.* at 9–10. Forty of the seventy-five applicants, including Ms. Finkle, were selected to participate in horse and rider evaluations, which were to be conducted by the commander of the MNCPP's mounted patrol unit, Sergeant Rick Pellicano. *Id.* at 10. When Lt. Black asked Sgt. Pellicano for his advice on whether HCPD's VMP should accept retired police officers, mentioning that he intended to participate after his upcoming retirement, Sgt. Pellicano advised against it. *Id.* at 10, Exh. 2 (Black Affidavit), ¶ 16. Sgt. Pellicano explained that he believed current and retired police officers to be more confrontational, and that a retired police officer in his unit had caused some discord. *Id.* Lt. Black decided to withdraw himself from the selection process, and he advised Ms. Finkle, also a retired police officer, of his withdrawal and why. *Id.* ¶¶ 17–18. Although Lt. Black had doubts about whether Ms. Finkle would be a good fit for the HCPD VMP, he did not suggest that she withdraw. *Id.* ¶ 18 ("Though I had decided we should not take retired police officers, I did not tell Ms. Finkle she would have to withdraw from the application process. First, I considered her a friend, and second, I thought if she wanted to go through the process, she should be given the opportunity, and could perhaps persuade the interview committee that she should be selected."). Ms. Finkle continued with the application process. Def. Mot. 10. After ranking eighteen out of thirty-one in the horse and rider evaluations, Ms. Finkle, along with nineteen other applicants, was selected for an interview. *Id.* at 11. Twelve

applicants would be selected for the VMP's inaugural class. *See id.*, Exh. 2 (Black Affidavit), ¶ 22.

On December 7, 2011, Ms. Finkle was interviewed by Lt. Black, Sgt. William Cheuvront, and Lt. Paul Yodzis at the HCPD headquarters.[2] Def Mot. 12. While at the HCPD headquarters, prior to her interview, Ms. Finkle ran into Chief McMahon, who said hello, asked what she was doing there, and wished her luck after she explained that she was interviewing for a position with the VMP. *Id.* All interviewees were asked the same questions, and their answers were recorded on interview sheets, which included specific categories and rating levels. *Id.* at 13. While Ms. Finkle received "above standard" ratings, the three selecting officers—Lt. Black, Sgt. Cheuvront, and Lt. Jacobs[3]—ultimately decided to not offer her a position. *Id.* at 13–14. When discussing Ms. Finkle's application, Lt. Black reiterated Sgt. Pellicano's recommendation to not select retired police officers, especially considering the type of informal, non-confrontational mounted unit the HCPD aimed to develop. *See id.*, Exh. 8 (Cheuvront Affidavit), ¶ 8 ("When Ms. Finkle's name came up, Lt. Black mentioned that she was a former police officer and stated that he had been advised not to take current or retired police officers because they would tend to be more aggressive and more likely to respond to an incident, which was not the route we wanted to go with the Volunteer Mounted Patrol, as we intended that would be completely non-confrontational."). The selecting officers considered the fact that another applicant, Thomas Thelen, was a retired U.S. Secret Service agent, but they agreed that his job duties were

---

[2] All interviews were conducted by Lt. Black, Sgt. Cheuvront, who would be the direct supervisor of the VMP, and either Lt. Jacobs, the outgoing special operations lieutenant, or Lt. Yodzis, who would be taking over for Lt. Jacobs. Def. Mot., Exh. 2 (Black Affidavit), ¶ 20.

[3] While Lt. Yodzis was on the panel that interviewed Ms. Finkle, he was not involved in the discussions selecting candidates. Def. Mot., Exh. 7 (Yodzis Affidavit), ¶¶ 3–4.

significantly different than that of a police officer and did not raise the same concerns regarding confrontation with the public. Def. Mot. 14.

The selecting officers also discussed how Ms. Finkle seemed to "take over" in her interview, and how, when asked if she had any questions, she began to question them about various incident management protocols. *Id.* According to Lt. Black, this interrogation seemed to underscore his belief that Ms. Finkle may not jibe with the program they were trying to create. *See id.*, Exh. 2 (Black Affidavit), ¶ 21 ("Ms. Finkle's interview confirmed my observation that she was more of a commander than a subordinate team member who might not fit in well with the type of mounted patrol we were creating."). Ultimately, the selecting officers found Ms. Finkle to be overqualified for the VMP position. Def. Mot. 14. In addition, the selecting officers discussed how Ms. Finkle's stated response time—namely, the time it would take for her to arrive with her horse at a deployment site in Howard County—was three hours, which was double the next longest response time of any other interviewee. *Id.* at 13–14. According to the selecting officers, at no point did Ms. Finkle's appearance or the fact that she is transgender enter their discussion. *Id.* at 14. At the time, only Lt. Black was aware that Ms. Finkle was transgender. *Id.*; *see* Def. Reply, Exh. 1 (Black Second Affidavit). Chief McMahon, who gave the final approval for the twelve applicants ultimately selected for the VMP, also was not aware that Ms. Finkle was transgender until she filed the instant lawsuit. Def. Mot., Exh. 3 (McMahon Affidavit), ¶ 15.

On December 21, 2011, Lt. Black telephoned Ms. Finkle to personally notify her that she had not been selected for the VMP's inaugural class, but that her application would be kept on file for a later class. Def. Mot. 15, Exh. 2 (Black Affidavit), ¶ 26. Lt. Black tried to explain to Ms. Finkle the reasons for their decision, but when he told her that she was not selected largely

because the HCPD was not comfortable taking former police officers, she hung up on him. *Id.*

The next day, Ms. Finkle e-mailed Lt. Black with the subject line "Sorry." Def. Mot., Exh. 31.

She explained:

> I wanted you to know that I consider [you] a great friend.
>
> Please know that if you were not retiring next week I would not have submitted my discrimination compliant [sic] letter against HCPD and my notice to withdraw from all VMP processes. Certified mail takes longer to get from point A to point B, so I hope you are happily retired before Bill receives the letter.
>
> Hopefully we can chat after you retire.

*Id.* On December 26, 2011, Lt. Black replied to Ms. Finkle's e-mail:

> Sorry to hear you feel this way. I always wanted to do the mounted patrol also, but understood the rationale about ex-cops and being confrontational by nature. I think your reaction proves this to some extent, and unfortunately legitimizes the theory. I bowed out of this first class because of my [law enforcement officer] experience, but fully intend to try again once the dust settles and the unit is established. I don't think it will matter once it's up and running, but it is imperative that this unit start off as non-confrontational as possible. You have helped me to get this started, and I was hoping your efforts could have continued in the academy.
>
> There were other factors that resulted in you being placed on hold for the next class. Primarily, you told the interview panel that your response to the Ellicott City area was three hours. We prefer to establish more of a local presence for this first class. The thought is that locals will be more likely to ride more often, especially on the assignments that are only an hour. We find it not probable that people that live far away will be available on a routine basis, and the long-term sustainability of them participating in the program would be in question.
>
> Also, during your interview, you came on pretty strong. Your questions pertaining to [Incident Command System] weren't well received, and indicated that you were overqualified for the position. If we were looking for an administrator, you would be perfect. Unfortunately, we are looking for non-confrontational people that can be molded into what we're looking for. We started out with 75 people interested in the program, and had to get it down to 12. It was a difficult endeavor to sort through the under-qualified, over-qualified, and qualified applicants to reach this number. Right or wrong, we did the best we could in the best interest of the program.

>I am hoping our friendship can continue, and that you will reconsider participating in the program in the future. I also am hopeful that we can maintain a professional working relationship within Trotsar.

*Id.* On December 28, 2011, Chief McMahon received Ms. Finkle's letter, wherein she objected to not being selected for the VMP because she is a retired law enforcement officer, that doing so is "pure discrimination that is directed towards a class of persons (retired law enforcement officers?)," that she was never formally advised of this policy, and that she wanted to be immediately removed from any VMP waiting list. Def. Mot., Exh. 30. Ms. Finkle also stated: "While I realize I have little to no civil rights protection from being discriminated as a retired law enforcement officer, I am left to question if research if [sic] my age or gender came into play with HCPD's decision." *Id.* In a letter dated December 30, 2011, Chief McMahon wrote to Ms. Finkle that he "regretfully accept[ed]" her request to remove her name from the VMP waiting list, and he thanked her for her assistance to Lt. Black in getting the VMP running. *Id.*

According to Ms. Finkle, in March, 2012, she learned that another retired police officer was selected for the VMP, and that at least two people selected for the VMP lived farther away from Howard County than she did. Compl. ¶ 29. In June, 2012, Ms. Finkle filed a formal charge of discrimination with the Maryland Commission on Civil Rights ("MCCR"). Def. Reply, Exh. 2. She complained of discrimination based on sex and sexual orientation.[4] *Id.* In July, 2012, the U.S. Equal Employment Opportunity Commission ("EEOC") issued Ms. Finkle a notice of charge of employment discrimination under Title VII on the basis of sex, in connection with her complaint with the MCCR. *Id.* In August, 2013, the EEOC issued Ms. Finkle a "right to sue" letter. Compl. ¶ 35. Ms. Finkle filed suit on October 31, 2013. [ECF No. 1]. Shortly thereafter,

---

[4] Ms. Finkle subsequently has stated that her discrimination claim is not based on sexual orientation. *See* ECF No. 7 (Pl. Opp. to Def. Mot. to Dismiss), p. 6 ("The Defendant's further arguments regarding discrimination against women or homosexuals are particularly misplaced. Sgt. Finkle does not claim either herein."); Def. Mot., Exh. 1 (Finkle Deposition), Tr. 156:3–6 ("Q: And again, I just want to confirm, we have gone through this before. Sexual orientation is not part of this lawsuit, correct?  A: Sexual orientation, no.").

Howard County filed a motion to dismiss, [ECF No. 4], which Judge Bredar denied, although he described it as a "close call." [ECF No. 18]. With discovery complete, both parties now move for summary judgment.[5]

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247–48.

"When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (internal quotation marks omitted). This Court must "not . . . weigh the evidence and determine the truth of the matter," but rather should "determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

## III. DISCUSSION

### a. Legal Framework

Under Title VII, an employer may not "fail or refuse to hire or . . . discharge any individual . . . because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Ms. Finkle argues that Howard County discriminated against her on

---

[5] Both parties have now consented to proceed before a U.S. Magistrate Judge. [ECF Nos. 25, 28].

the basis of "sex, *to wit*, her gender identification and non-conforming gender conduct," when the HCPD denied her a position with its VMP unit. Compl. 1. In his memorandum opinion denying Howard County's motion to dismiss, Judge Bredar reasoned that, in the wake of *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), wherein the Supreme Court held that Title VII's prohibition on sex discrimination encompasses discrimination on the basis of an employee's failure to conform to gender stereotypes, "it would seem that any discrimination against transsexuals (as transsexuals)—individuals who, by definition, do not conform to gender stereotypes—is proscribed by Title VII's proscription of discrimination on the basis of sex." [ECF No. 18, p. 12]. Thus, Judge Bredar found that discrimination based on Ms. Finkle's "'obvious transgendered status'" was a cognizable Title VII claim of sex discrimination. *Id.* at 13 (quoting Compl. ¶ 30).[6] While neither the Supreme Court nor the Fourth Circuit's Title VII jurisprudence has addressed transgender status, the U.S. Justice Department recently clarified that Title VII protection extends to sex discrimination claims based on an individual's gender identity, including transgender status.[7] Indeed, Howard County does not contest that Ms. Finkle, as a transgender woman, falls within the ambit of Title VII protection against sex discrimination.

---

[6] Judge Bredar also found that a position with the Volunteer Mounted Patrol, though unpaid, still constituted "employment" under Title VII. [ECF No. 18, p. 10 ("This Court, however, is bound by the Fourth Circuit's pronouncements in *Haavistola* and therefore cannot find, as a matter of law, that the 'significant remuneration benefits available upon injury or death' Plaintiff would have received as an [Auxiliary Police Officer] in the VMP are insufficient to bring her under the ambit of Title VII." (quoting Compl. ¶ 41) (citing *Haavistola v. Cmty. Fire Co. of Rising Sun, Inc.*, 6 F.3d 211, 222 (4th Cir. 1993))].

[7] Memorandum from the U.S. Attorney General, *Treatment of Transgender Employment Discrimination Claims Under Title VII of the Civil Rights Act of 1964* (Dec. 15, 2014), *available at* http://www.justice.gov/file/188671/download ("After considering the text of Title VII, the relevant Supreme Court case law interpreting the statute, and the developing jurisprudence in this area, I have determined that the best reading of Title VII's prohibition of sex discrimination is that it encompasses discrimination based on gender identity, including transgender status. The most straightforward reading of Title VII is that discrimination 'because of . . . sex' includes discrimination because an employee's gender identification is as a member of a particular sex, or because the employee is transitioning, or has transitioned, to another sex.").

Def. Mot. 21. Thus, this Court has considered Ms. Finkle's sex discrimination claim both as to her transgender status and as to her alleged non-conformance with gender stereotypes.[8]

When analyzing a sex discrimination claim under Title VII, a court must first consider whether the plaintiff has shown any direct or circumstantial evidence of intentional discrimination. *See Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 959 (4th Cir. 1996) ("To satisfy ordinary principles of proof, [the plaintiff] must provide direct evidence of a purpose to discriminate or circumstantial evidence of sufficiently probative force to raise a genuine issue of material fact."). "[E]vidence is direct if it establishes discriminatory motive with no need for an inference or a presumption." *Hart v. Lew*, ELH-12-03482, 2015 WL 521158, at *22 (D. Md. Feb. 6, 2015) (internal quotation marks omitted). Under a mixed-motive theory of sex discrimination, the plaintiff must demonstrate, through direct or circumstantial evidence, that his/her sex was "a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m); *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 101 (2003).

"Absent direct evidence of intentional discrimination, claims under Title VII are analyzed under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–07 (1973)." *Stokes v. Virginia Dep't of Corr.*, 512 F. App'x 281, 282 (4th Cir. 2013). First, the plaintiff-employee must prove a *prima facie* case of discrimination by a preponderance of the evidence. If the plaintiff establishes a *prima facie* case, thereby creating a presumption of unlawful discrimination, the burden then shifts to the defendant-employer to

---

[8] By referring to Ms. Finkle's "non-conformance with gender stereotypes," the Court is using Ms. Finkle's self-identified description of herself to consider the merits of her claims, and makes no finding that she does or does not conform to gender stereotypes. *See, e.g.*, Compl. 1 (complaining of discrimination because of her "gender identification and non-conforming gender conduct"); Pl. Cross-Mot. 5 ("In *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), the Supreme Court ruled that this prohibition [of sex discrimination] specifically includes sex stereotyping, based on gender non-conforming behavior and appearance such as that of Sgt. Finkle.").

articulate legitimate, nondiscriminatory reasons for its employment action. If the employer does so, the burden shifts back to the plaintiff to show that the given reasons for the employer's actions are a mere pretext for its true discriminatory motives. *McDonnell Douglas Corp.*, 411 U.S. at 802–04. While "the mixed-motive framework forces plaintiffs to prove only that a forbidden factor—notwithstanding the presence of permissible factors—caused the challenged conduct," the "pretext analysis represents a more rigorous rule than the mixed-motive analysis as it ordinarily obligates plaintiffs to prove that a single forbidden factor—to the exclusion of other factors—animated the employer's adverse action." *Westmoreland v. Prince George's Cnty., Md.*, 876 F. Supp. 2d 594, 612 (D. Md. 2012).

Because FEPA is the state law analogue of Title VII and its interpretation is guided by federal cases interpreting Title VII, the analysis of Ms. Finkle's Title VII claim shall constitute the analysis of her FEPA claim. *See* ECF No. 18, p. 5; *Haas v. Lockheed Martin Corp.*, 396 Md. 469, 482, 914 A.2d 735, 742 (2007); *Molesworth v. Brandon*, 341 Md. 621, 632–33, 672 A.2d 608, 614 (1996).

    **b. Analysis**

For the reasons discussed below, the Court finds that Ms. Finkle has failed to show any direct or circumstantial evidence of intentional discrimination, and also has not met her burden under the *McDonnell Douglas* burden-shifting framework. Howard County is therefore entitled to judgment as a matter of law.

    **1. Direct or Circumstantial Evidence**

Ms. Finkle has provided no direct or circumstantial evidence that the HCPD denied her the VMP position because she is transgender, or because of her self-identified non-conformance with gender stereotypes, or that either factor was a motivating factor in its decision. While Ms.

Finkle argues that Howard County's email system is "rife with discriminatory animus," she can point to, at most, one e-mail from March, 2011 wherein Lt. Black corresponded with a fellow officer, Bonita Linkins, about HCPD transgender awareness training. Pl. Cross-Mot., Exh. A.[9] Lt. Black wrote: "Hope not promoting the idea??!!," to which Ms. Linkins responded: "Lol lol lol lol lol!!!" *Id.* Yet, "[d]irect evidence must be evidence of conduct or statements that *both* reflect directly the alleged discriminatory attitude *and* that bear directly on the contested employment decisions." *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 520 (4th Cir. 2006) (emphasis added) (internal quotation marks omitted). Even if this isolated instance reflected directly on Lt. Black's allegedly discriminatory attitude towards transgender persons, it had no relation to the VMP selection process, or the selecting officers' decision to not offer Ms. Finkle a position. In fact, the selection process did not begin until six months after Lt. Black's e-mail, and decisions were not made until nine months after. "Even if there is a statement that reflects a discriminatory attitude, it must have a nexus with the adverse employment action." *Id.*; *see U.S. E.E.O.C. v. CTI Global Solutions, Inc.*, 815 F. Supp. 2d 897, 907 (D. Md. 2011) ("Where the derogatory statement bears little relation to the contested employment action and is attenuated by time, a plaintiff will likely fail to satisfy the nexus requirement."). There is simply no established connection between Lt. Black's e-mail comment and Ms. Finkle not being selected for the VMP position.

The other three department e-mails that Ms. Finkle cites as evidence include remarks about homosexuals, yet Ms. Finkle has repeatedly stated that her discrimination claim is not based on sexual orientation. *See supra* fn.4. This evidence is therefore irrelevant. Even so,

---

[9] Although Ms. Finkle submitted to the Court paper copies of Exhibits A–K with her Cross-Motion for Summary Judgment, she attached only Exhibits F–K to her Cross-Motion for Summary Judgment filed on CM/ECF. It appears that Exhibits A–E submitted to the Court are identical to exhibits A–E filed with Ms. Finkle's opposition to Howard County's motion for protective order (ECF No. 40).

these e-mail comments were not connected in any way to the VMP selection process, or to the selecting officers' decision to not select Ms. Finkle. *See* Pl. Cross-Mot., Exhs. B, D, E.

In her Complaint, Ms. Finkle complained about her encounter with Chief McMahon immediately prior to her interview for the VMP position, and his alleged actions afterwards. She states: "Upon information and belief, McMahon shortly thereafter expressed to Lt. Black his displeasure with Finkle's application to be a member of the horse mounted auxiliary." Compl. ¶ 26. In her deposition, when asked about her encounter with Chief McMahon, Ms. Finkle stated that she interpreted his "nonverbal communication" as conveying "something is not right here." Def. Mot., Exh. 1, Tr. 164:5–16. When asked for evidence to support the allegation in her Complaint, Ms. Finkle concluded that, because her interview went so well, and she ultimately was not offered the VMP position, "[s]omething happened after I left that interview. What, I don't know." *Id.*, Tr. 169:21–171:5. The Court is not persuaded that Ms. Finkle's subjective understanding of Chief McMahon's conduct, and her speculative conclusion that he conveyed to Lt. Black his disapproval of Ms. Finkle applying for the VMP position, constitute evidence of discrimination.

While Ms. Finkle complains that the Court deprived her of "ordinary discovery to refute factual claims by the Defendant"—namely, by issuing a protective order prohibiting Ms. Finkle from obtaining the personal account information for all e-mail, social media, and telephone accounts of the HCPD employees involved in the VMP selection process, *see* ECF No. 43—Ms. Finkle was not precluded from "ordinary discovery" obtained through depositions. However, Ms. Finkle chose to not depose any of the relevant witnesses. Ms. Finkle also complains that much of Howard County's evidence is provided via "self-serving affidavits." While the case law is clear that a plaintiff's self-serving affidavits cannot suffice to defeat summary judgment, *see*

13

*National Enterprises, Inc. v. Barnes*, 201 F.3d 331, 335 (4th Cir. 2000), a party is allowed to present evidence to support its side of the case, particularly where, as here, the opposing party did not seek to question the witnesses under oath.  Ms. Finkle's argument therefore fails.

In sum, Ms. Finkle has failed to provide any direct or circumstantial evidence that Howard County discriminated against her because she is transgender, or because of her self-identified non-conformance with gender stereotypes.  Moreover, Ms. Finkle has offered no direct or circumstantial evidence that either factor was a motivating factor in the decision to not select her for the VMP position.  She must therefore rely on the *McDonnell Douglas* burden-shifting framework.

### 2. *McDonnell Douglas* Framework

To establish a *prima facie* case of discrimination regarding her non-selection for the VMP position, Ms. Finkle must prove that: (1) she is a member of a protected class; (2) she applied for the VMP position; (3) she was qualified for the VMP position; and (4) she was rejected for the VMP position in favor of someone not a member of her protected class under circumstances giving rise to an inference of unlawful discrimination.  *See Alvarado v. Bd. of Trs. of Montgomery Cmty. Coll.*, 928 F.2d 118, 121 (4th Cir. 1991).  As previously discussed, and as conceded by Howard County, Ms. Finkle, as a transgender woman, and, by her own allegations, a person who does not conform to gender stereotypes, is a member of a protected class under Title VII.  Ms. Finkle applied for the VMP position in September, 2011.  Although Ms. Finkle goes to great lengths to show that she was qualified for the position, Howard County does not dispute that she was qualified.  In fact, the HCPD selecting officers concluded that Ms. Finkle was *over*-qualified for the position.  Thus, the first three elements of the *prima facie* case are satisfied.

However, Ms. Finkle has provided no proof that she was rejected for the VMP position in favor of someone not in her protected class. There were twelve individuals, both male and female, selected for the VMP, and Ms. Finkle has not proven, nor even asserted, that those twelve individuals are not transgender, or that they otherwise conform to gender stereotypes. The only reference Ms. Finkle makes to this required showing is when she claims that one retired Secret Service agent selected for the VMP, Thomas Thelen, was "obviously not transgendered." Pl. Cross-Mot. 14. Ms. Finkle has provided no evidence to support this assertion—she did not obtain any information from Mr. Thelen personally—and the Court cannot make this assumption.

Ms. Finkle also has pointed to no evidence in the record, besides her own perception and beliefs, from which the Court can infer discrimination. The record demonstrates that Ms. Finkle's gender identity played no role in the decision to not select her for the VMP position; in fact, during the selection process, only Lt. Black was aware that Ms. Finkle was transgender. Def. Mot. 21. Moreover, there is nothing to suggest that Ms. Finkle's "non-conforming gender conduct" was considered by the selecting officers. To the extent that the selecting officers' discussion of Ms. Finkle's "commanding" behavior and tendency to "take over" in her interview had any relation to "non-conforming gender conduct," the only comments the selecting officers made with regards to this behavior relate to Ms. Finkle's past experience as a commanding law enforcement officer, not her status as a transgender woman. For these reasons, Ms. Finkle has not proven by a preponderance of the evidence a *prima facie* case of discrimination.

Moreover, even if Ms. Finkle could establish a *prima facie* case of discrimination, Howard County has articulated legitimate, nondiscriminatory reasons for not selecting Ms. Finkle for the VMP position, and Ms. Finkle has not shown that these reasons are a mere pretext

for discrimination. Howard County proffers three reasons for not selecting Ms. Finkle: (1) she is a retired police officer; (2) her stated response time of three hours was substantially longer than all other interviewees; and (3) her extensive experience as a retired police officer, and as the current commander of TrotSAR, would impede her from "fitting in" as a regular team member, rather than as someone in command. Def. Mot. 26–28.

Ms. Finkle argues that Howard County's refusal to select retired police officers was discriminatory in itself, because it violates the Age Discrimination in Employment Act ("ADEA"). Pl. Cross-Mot. 12–13. However, Ms. Finkle cannot raise an ADEA claim without first exhausting administrative remedies. *See* 29 U.S.C. § 626(d)(1); *Jones v. Calvert Grp., Ltd.*, 551 F.3d 297, 300 (4th Cir. 2009) (noting that a plaintiff's failure to exhaust administrative remedies concerning an ADEA claim deprives federal courts of subject matter jurisdiction over the claim). In any event, a retired police officer does not necessarily have to be at least forty years of age, which is a requirement for protection under the ADEA. *See* 29 U.S.C. § 631(a). Ms. Finkle also argues that, by refusing to hire retired police officers, Howard County is in violation of Howard County Code Section 12-208(I)(a), which prohibits employment discrimination on the basis of occupation. Pl. Cross-Mot. 14. Again, Ms. Finkle cannot legitimately raise this claim, because she did not "file[] a complaint with the county unit responsible for handling violations of the county discrimination laws." Md. Code, State Gov't § 20-1202(c)(2)(i). Nevertheless, the plain language of the Howard County Code prohibiting employment discrimination because of "occupation" does not include *former* occupations. Ms. Finkle has provided no arguments to the contrary. Most importantly, Ms. Finkle's overall argument, that Howard County's proffered reason is not "nondiscriminatory" because it violates

the ADEA and the Howard County Code, misses the point—Title VII and FEPA, on which her lawsuit is based, do not prohibit discrimination against retired police officers.

Additionally, Ms. Finkle argues that, because the HCPD selected Thomas Thelen, a retired Secret Service agent, Howard County cannot legitimately claim that it did not select Ms. Finkle because she is a retired police officer. Pl. Cross-Mot. 14–15. Ms. Finkle compares the job responsibilities of Mr. Thelen and herself, noting that Mr. Thelen's job was to "protect the President of the United States and the White House," and her job was to "protect the Congress and the Capitol buildings." *Id.* Furthermore, Ms. Finkle argues, both Mr. Thelen and she "had statutory powers of arrest and both carried firearms in the performance of their duties," yet she opted to "refrain from burdening the record with superfluous documentation of these otherwise readily verifiable and judicially noticeable facts." *Id.* at 13, n.3. The Court is not persuaded by Ms. Finkle's purely speculative understanding of Mr. Thelen's former job responsibilities. To the contrary, Howard County has provided evidence that Mr. Thelen spent the majority of his career with the Secret Service at a desk job investigating white collar crime, not out in the community. Def. Reply 12.

Regarding its second proffered reason for not selecting Ms. Finkle, Howard County explains that all the VMP candidates were asked to estimate the amount of time it would take to arrive in Howard County with their horse for a patrol assignment, and that Ms. Finkle's estimated response time was longer than all other interviewees. Def. Mot. 27. In her Complaint, Ms. Finkle complained that the HCPD hired two individuals for the VMP who lived farther away from Howard County than she did. Compl. ¶ 29. Ms. Finkle's logic is flawed, however, since the distance from one's home to Howard County does not necessarily equate to one's response time to Howard County. If an individual lives close to or in Howard County, but boards their

horse far away from Howard County, their response time may be longer to retrieve their horse and then come back to Howard County for a patrol assignment.

Lastly, with respect to the selecting officers' belief that Ms. Finkle would not be a "good fit" for the VMP, the Court will not "sit as a kind of super-personnel department weighing the prudence of employment decisions." *DeJarnette v. Corning, Inc.*, 133 F.3d 293, 299 (4th Cir. 1998) (quoting *Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 410 (7th Cir. 1997)). Rather, the Court's sole concern is "whether the reason for which the defendant [did not select] the plaintiff was discriminatory," not "whether the reason was wise, fair, or even correct." *Id.* (quoting *Giannopoulos*, 109 F.3d at 410–11). It is Ms. Finkle who must "present sufficient evidence to enable a factfinder to reject the employer's non-discriminatory explanation." *Riddick v. MAIC, Inc.*, Civil No. JKS 09-33, 2010 WL 4904681, at *6 (D. Md. Nov. 24, 2010), *aff'd* 445 F. App'x 686 (4th Cir. 2011). Ms. Finkle has not done so here.

In sum, Ms. Finkle has not met her burden under the *McDonnell Douglas* burden-shifting framework, and Howard County is therefore entitled to summary judgment. Likewise, Ms. Finkle has failed to demonstrate that she is entitled to summary judgment.

## IV. CONCLUSION

For the reasons set forth above, Howard County's Motion for Summary Judgment [ECF No. 49] is **GRANTED**, and Ms. Finkle's Cross-Motion for Summary Judgment [ECF No. 57] is **DENIED**. A separate Order follows.

Dated: June 12, 2015

/s/
Stephanie A. Gallagher
United States Magistrate Judge